2023 IL App (1st) 190829-U
No. 1-19-0829

FIRST DIVISION
November 20, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 99 CR 3428 |
| | ) | |
| SIDNEY McCRAY, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Carol M. Howard, |
| | ) | Judge Presiding. |

---

JUSTICE Pucinski delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1   *Held:* We affirm the circuit court's judgment denying defendant's postconviction petition after a third-stage evidentiary hearing on his claim of actual innocence where the circuit court's finding that the new witness's testimony was not reliable was not manifestly erroneous, and the new evidence would not have probably changed the result on retrial.

¶ 2   Following a third-stage evidentiary hearing under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), the circuit court denied defendant's request for a new trial based on his allegation that he was actually innocent of the first-degree murder, home invasion, and armed robbery of Dwayne Hill in October of 1998. Defendant now appeals, contending that

the denial of a new trial was manifestly erroneous. Specifically, defendant argues that the circuit court's decision to deny him postconviction relief after a third-stage evidentiary hearing was manifestly erroneous where the evidence presented would have probably changed the trial outcome. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                BACKGROUND

¶ 4        On October 29, 1998, Dwayne Hill was found fatally shot in an alley behind 3263 West Maypole, Chicago, Illinois. Defendant and two codefendants, Antonio Richardson and Timothy Stephens, were charged in connection with the shooting death of Dwayne Hill. In a jury trial before the Honorable Dennis Dernbach, defendant was tried separately from his two codefendants, Timothy Stephens and Antonio Richardson, who testified as witnesses for the State. The jury found defendant guilty of first-degree murder, home invasion and armed robbery. The trial court subsequently sentenced him to 45 years' imprisonment for first degree murder with two 20-year concurrent sentences for home invasion and armed robbery. We affirmed on direct appeal. *People v. Sidney McCray*, No. 1-04-1188 (March 2, 2007) (unpublished order pursuant to Illinois Supreme Court Rule 23). We rely upon the facts detailed in the prior order as well as additional facts relevant to resolve the issue raised in the instant appeal.

¶ 5                                  Trial[1]

¶ 6                  Chicago Police Detective Terrance O'Connor

_____

[1] At trial, the State presented the testimony of Rontral Lee and presented his handwritten statement after Lee denied that he gave a handwritten statement to the police and an assistant state's attorney. In that statement, he admitted, in part, that defendant made inculpatory statements to him that he robbed and shot Hill. However, on direct appeal, this court found that Lee's statement did not satisfy the personal knowledge requirement for admissibility pursuant to 725 ILCS 5/115-10.1. *People v. Sidney McCray*, No. 1-04-1188 (March 2, 2007) (unpublished order pursuant to Illinois Supreme Court Rule 23). Therefore, we will not consider Lee's testimony in our analysis of the evidence in this case.

¶ 7        Detective O'Connor testified that on October 29, 1998, at approximately 5:30 a.m., along with Detectives Mike Duffin and Mike Hughes, he went to the alley behind 3263 West Maypole to investigate the discovery of a dead body. The body was leaning against a guardrail in a seated position. Detective O'Connor testified that he saw a gunshot wounds to the victim's head, and blood pooled in the area. The victim was wearing jogging shorts and a t-shirt but was not wearing any shoes. There were also three cartridge casings behind the victim's body and a shoe print in the blood near the victim's body. A metal safe, also described as a fire box, was found near the alley, approximately 70 feet east of the victim's body. After canvassing the area, the detectives still did not know the identity of the shooting victim.

¶ 8        Once the detectives went back to Area Four Police District, Veronica Dunlap and Kimberly Stewart came into the station to report that Veronica's boyfriend, Dwayne Hill, who lived in the 3200 block of Maypole, was missing. The detectives drove to Hill's address at 3229 West Maypole and found that his basement apartment had been ransacked. Detective O'Connor described the residence as a traditional two-flat, and the entrance to the basement was on the first floor. The detective learned that Hill's father lived on the first floor and Hill lived in the basement. The State introduced photos of Hill's basement apartment at trial, showing that drawers in the kitchen and the bedroom areas were pulled out, the kitchen counters were covered in debris, and Hill's bed was pulled off its frame. Detective O'Connor called for the crime scene investigators to photograph the apartment. He testified that Hill's body was found approximately eight houses west of the Hill's apartment.

¶ 9        Detective O'Connor testified that he then went back to the police station, and between 2:00 and 3:00 p.m., he received a phone call from "Miss Anderson," who said that people who lived at

3220 West Maypole had information about Hill's murder. The detective went to that address and knocked on the door. No one answered.

¶ 10                    Forensic Investigator Dale Principato

¶ 11      Dale Principato, a forensic investigator with the Chicago Police Department, received an assignment to go to the crime scene at 5:55 a.m. He saw Hill, along with cartridge casings behind him, blood next to him, and a safe nearby. When he arrived, he saw that it was raining, and the area was wet from the rain. He took photographs of the scene and collected three cartridge casings, which appeared to be .45 caliber. He also collected a vial of blood from the blood next to Hill. He dusted the safe for latent fingerprints. Then, he went to the basement apartment at 3229 West Maypole, took photographs, and dusted for latent fingerprints. He also took photographs and dusted for latent fingerprints from Hill's car, which was parked in front of the residence. He did not find any latent fingerprints on the safe, inside the basement apartment, or from Hill's car.

¶ 12                         Doctor Nancy Jones

¶ 13      Doctor Nancy Jones testified that she conducted an autopsy of Dwayne Hill. An external examination of his body showed three gunshot entrance wounds, the first one located on his left cheek, the second one located on his left ear, and the third one located on the front of his right shoulder. None of the wounds showed evidence of close-range firing. She did not observe any stippling around these entrance wounds. X-rays showed that there were foreign metallic objects consistent with bullets located on the right side of Hill's neck and his right elbow. She determined that the cause of death was multiple gunshots wounds, and the manner of death was homicide.

¶ 14                           Brian Mayland

¶ 15      It was stipulated that Brian Mayland, an expert in the field of firearms, would testify that he examined the three .45 caliber automatic fired cartridge casings. He determined that they were all

fired from the same firearm. He also examined the two bullets recovered in this case and determined that they were fired from the same firearm.

¶ 16                                                    Julie Wessel

¶ 17      Julie Wessel testified as an expert in the field of latent fingerprints. She tested the three cartridge casings in this case. She did not find any latent fingerprint impressions suitable for comparison on them. She explained that it is "rare" to get a suitable latent impression on a cartridge case but it has happened in other instances.

¶ 18                                                  Veronica Dunlap

¶ 19      Veronica Dunlap testified that she was dating Hill at the time of his death and that Hill lived in the basement apartment of a house on Maypole. She called him when he did not arrive to pick up her kids to take them to school on the morning of October 29th. When he did not answer, she went to his house and saw his car parked there and, looking through a window, saw that his basement apartment had been ransacked. Then, she went to the police station to see if he had been arrested, and she learned that the police had found him dead. She testified that she had previously seen a safe in Hill's room in the basement and identified the safe recovered from the scene as belonging to Hill. She testified that Hill sold marijuana and cocaine, kept drugs around his house, including large quantities of marijuana.

¶ 20                          Chicago Police Detective Cornelius Longstreet

¶ 21      Detective Longstreet testified that he was working this case with Detectives David Wright and Stanley Sanders. He received information as to possible suspects, including "Shorty-T, Ray Ray, Sidney and Brother." After speaking with the victim's brother,[2] he learned that "Shorty-T" was William Thompson, "Ray Ray" was Antonio Richardson, "Sidney" was defendant, and "Brother"

---

[2] Detective Longstreet did not identify the name of the victim's brother.

was Melvin Bradford. On November 14th, the detectives located Antonio "Ray Ray" Richardson and Melvin "Brother" Bradford at different locations. On November 15th, the detectives located an additional suspect, Timothy "Jerry" Stephens. Antonio Richardson and Timothy Stephens were eventually charged in this case, but Melvin Bradford and William Thompson were not charged. The detectives were unable to locate defendant at this time.

¶ 22                    Timothy Stephens' Handwritten Statement

¶ 23        Timothy Stephens (Stephens) testified that he was incarcerated for armed robbery and home invasion related to this case. He was also previously convicted in two drug cases in 1994 and 1996. He knew defendant from the neighborhood, and he knew Hill through Hill's sister and brother.[3] He testified that during the evening and early morning of October 28 through 29, 1998, he was at his home at 3503 West Adams, along with his mother and his daughter. He denied that he went to the Hill's home and that he was involved in the robbery and shooting of Hill. He asserted that he pled guilty in this case because he was afraid that if he went to trial and lost, he would be sentenced to a longer term of imprisonment.

¶ 24        He further testified that on November 14, 1998, he was picked up by the police while he was standing along the street at Sacramento and Fifth Avenue. The police took him to the police station and then told him why he was there. At that time, he did not know that Hill had been murdered. At the station, he spoke with Detective Longstreet and Detective David Wright. He testified that he was advised of his constitutional rights, but the detectives beat him during the two days that he spent in custody and told him what they wanted him to say. When Assistant State's Attorney David Williams (ASA Williams) arrived to speak with him, he told the version of events supplied by the detectives. He testified that he and the detectives rehearsed what he was going to say eight or nine

---

[3] Timothy Stephens did not identify the name of the victim's brother.

times. Although Stephens admitted that he made some of the statements contained in the written summary, he also denied the truth of those statements. He also testified that he was never alone with ASA Williams, that he asked ASA Williams if he could speak with him alone, to which ASA Williams agreed, but the detectives never left the room.

¶ 25   When he was subsequently sent to Cook County Jail, he was interviewed by medical personnel, reported that he had been beaten and that he was passing blood. He gave a urine sample and there was blood in his urine. He also testified that he did not have any marks or injuries on his body but had internal injuries. He admitted that he had a venereal disease at this time but denied that he had blood in his urine because he had a venereal disease.

¶ 26   Detective Wright testified that on November 14, 1998, he was involved in the arrest of Timothy Stephens. He denied that he used any type of physical force on Stephens and never saw anyone else use any type of physical force on him. He also testified that Stephens never complained to him that anyone else had hit him. He denied that he or Detective Longstreet told Stephens what to say to ASA Williams and denied that they rehearsed what Stephens was going to say to ASA Williams. During the investigation, he called the Cook County State's Attorney Office to have an assistant state's attorney assist in the investigation. When ASA Williams arrived, he and Detective Wright met with Stephens. Detective Longstreet was not present for these interviews. At 4:45 a.m., on November 17, 1998, ASA Williams advised Stephens of his constitutional rights, and took Stephens' handwritten statement. Detective Wright further testified that ASA Williams spent time alone with Stephens outside his presence.

¶ 27   ASA Williams testified that in the early morning hours of November 17, 1998, he went to Area Four Police District and met with Detective Wright. At 1:30 a.m., he and Detective Wright met with Stephens in the roll call room and informed him of his constitutional rights. He denied that

Detective Longstreet was present for the interviews. Stephens acknowledged his rights and agreed to waive them to speak about his involvement in the offense. During the first interview, Stephens provided an oral statement. ASA Williams spoke with Stephens alone, asked Stephens about how he was treated by the police, and Stephens never complained about the treatment he received from the police. Stephens never told him that a detective hit him in the chest or the ribs or that Detective Wright told him what to say. ASA Williams never heard Stephens express that he was in any pain or distress and did not notice anything unusual about Stephens' appearance.

¶ 28    After ASA Williams spent time interviewing other people at the station, he asked Stephens if he wanted to memorialize his statement and explained that process. Stephens stated that he wanted to do a handwritten statement. In his handwritten statement, Stephens stated that on October 23, 1998, he heard defendant say he was going to "hit *** a lick," that is, to rob the victim, in order to get some money for his birthday.

¶ 29    On October 29, 1998, Stephens, defendant, Melvin Bradford, a man known only as "Black Face," William Thompson, a man known as "Allan," and Antonio Richardson went to Hill's apartment. Pursuant to a plan they previously devised, Stephens knocked on Hill's door and asked to buy marijuana. When Hill opened the door, the others rushed in and overpowered him. Defendant and Melvin Bradford beat Hill and asked him where the "shit was at." The men searched Hill's apartment for money and drugs but found none. Hill then told Bradford that he kept a safe in the back room of the apartment.

¶ 30    After the men retrieved the safe, defendant forced Hill to strip to his underwear. The men, including Hill, went outside and through a parking lot to an area behind a building near Hill's apartment. At this time, Stephens, Antonio Richardson, and "Black Face" stayed in the alley to look out for police as defendant, Melvin Bradford, Allen, and William Thompson took Hill

towards the building to force him to open the safe while defendant kept the gun pointed at Hill. After emptying the contents of the safe, defendant ordered Hill to lie on his stomach. He stated that defendant pointed the gun at Hill's head and shot him in the head. Afterwards, everyone ran away.

¶ 31                          Antonio Richardson's Handwritten Statement

¶ 32        Antonio Richardson testified that he was incarcerated for his involvement in this case after pleading guilty to armed robbery and home invasion. He testified that he pled guilty because he was afraid of getting sentenced to a longer term of imprisonment. He also had a prior conviction for unlawful use of a weapon in 1997, and three prior juvenile adjudications of delinquency for possession of a controlled substance. He denied that his nickname was "Ray Ray." He admitted that he knew Hill his whole life and lived in the same neighborhood. He also admitted that he knew defendant, William "Shorty T" Thompson, and Timothy "Jerry" Stephens, but denied knowing Melvin "Brother" Bradford, and "Black Face."

¶ 33        He testified that on the night of Hill's death, he was at the home of his "baby momma" at Lamon and Iowa, and he denied that he left that home that night. He denied that he knew where Hill lived. He testified that he went to the police station on November 14th, but originally told the detectives that he was 19 years old even though he was 16 years old. He denied that the police informed him of his constitutional rights. He initially denied that he had a conversation with ASA Williams, and testified that he only conversed with Detectives Longstreet, Sanders, and Wright. However, he subsequently admitted that he did speak with ASA Williams. He testified that the police took his handwritten statement, not ASA Williams, and that he signed it, but he subsequently admitted that he told ASA Williams certain parts of his statement. He testified that he provided his address to ASA Williams, but he denied that he told ASA Williams the rest of the

contents of his handwritten statement. He denied that he told ASA Williams and the detectives that he was treated well by the police, that he had been given food and drink, that he was allowed to use the bathroom, that he was not threatened or promised anything in return for the statement, and that he gave the statement freely and voluntarily and free from the effects of drugs and alcohol.

¶ 34        Detective Wright testified that Antonio Richardson was arrested on November 14, 1998 and brought to Area Four Police District. At 6:15 a.m., on November 17, 1998, he was present, along with a youth officer, when ASA Williams took the handwritten statement of Antonio Richardson. He denied that Detectives Longstreet and Sanders were present during these interviews or wrote out any part of Richardson's statement. He saw Richardson review the handwritten statement and indicate changes or corrections that needed to be made. He denied that Richardson asked to make a phone call. He testified that ASA Williams was alone with Richardson at one point.

¶ 35        ASA Williams testified that he conducted an oral interview with Richardson and that Richardson originally said that he was 19 years old, but when the police later determined that he was a juvenile, a juvenile officer was brought in. During the initial interview, Richardson made a statement about the victim's murder including his own participation. Afterwards, he spoke with Richardson alone, outside the presence of any police officer, and Richardson did not complain about any police mistreatment or what the police may have previously said to him. ASA Williams testified that he subsequently spoke with Richardson a second time, along with Detective Wright, and provided him options to memorialize his statement. Richardson chose a handwritten statement.

¶ 36        While ASA Williams was taking Richardson's handwritten statement, Detective Wright and a youth officer were present. ASA Williams denied that Detective Longstreet was present. ASA Williams never heard Detective Wright tell Richardson what to say or supply answers for him, and Richardson never told him that Detective Wright fed him what to say. In his handwritten statement,

Richardson stated that around October 15, 1998, he was hanging around with defendant, William "Shorty T" Thompson, and Melvin "Brother" Bradford on Maypole Street near Hill's house. William Thompson said he was mad because nobody helped him when he was released from prison, and he wanted to "stick up" the victim. Then, on October 29, 1998, he was with defendant, William Thompson, Timothy "Jerry" Stephens, Melvin Bradford and "Black Face" by Hill's apartment. They devised a plan to have Timothy Stephens approach Hill's door and hold him up while defendant came forward with a gun and the rest of them would force their way into Hill's apartment. He stated that he thought that Hill would be a good person to rob because he sold "weed" and usually had a lot of money.

¶ 37    Hill arrived home in his Oldsmobile and as Hill was entering his home, Timothy Stephens stopped him and started talking to him. Then, defendant ran around the corner of the home holding a gun followed by William Thompson, Melvin Bradford and "Black Face." They forced their way into Hill's apartment, located in the front of the basement, where defendant and Melvin Bradford beat up Hill and yelled, "Where the s**t at." Everyone was looking for "weed" and money but did not find anything. Hill told them that he had a safe. While Melvin Bradford carried the safe, defendant had his gun pointed at Hill and made Hill remove his clothing except for a t-shirt and boxer shorts.

¶ 38    All of them left the apartment and went outside while Melvin Bradford carried the safe and defendant kept the gun pointed at the victim. Antonio Richardson and "Black Face" stood near the street to look out for the police, while defendant, William Thompson, Melvin Bradford, and Timothy Stephens had the victim in the back of the property, along with the safe. Richardson saw defendant shoot Hill in the head two or three times. Afterwards, Richardson ran away, eventually going to his grandmother's house.

¶ 39     Richardson also stated that during the evening of November 13, 1998, he saw defendant, who told him that he shot Hill in the head, but not to say anything. He stated that they planned to split the money but he never got any money or drugs. He was treated well by the police and ASA Williams, given food and drink, allowed to the use bathroom, was not threatened or promised anything in return for this statement, and he gave the statement freely and voluntarily and free from the effects of drugs and alcohol. He was also allowed to make corrections and changes to the statement, and he did so.

¶ 40                     <u>Defendant's Handwritten Statement</u>[4]

¶ 41     Chicago Police Detective Robert Hartman testified that on January 8, 1999, a female contacted the police, and he received information about defendant's whereabouts. Detective Hartman and other police officers went to that location, knocked on the door, and announced their office. The detective heard someone running from the front of the apartment to the rear of the apartment, and then he received a police radio transmission notifying him that defendant just tried to run out the back door. Someone inside the apartment opened the door, allowing the officers to enter the apartment, and defendant was found inside a closet, covered with clothing.

¶ 42     Defendant was arrested and taken to Area Four Police District and advised of his constitutional rights, which defendant indicated that he understood, and he agreed to talk with Detective Hartman and Detective Wright. Defendant said that he went to the victim's house on Maypole to meet William "Shorty T" Thompson, Antonio "Ray Ray" Richardson, Melvin "Brother" Bradford, and

---

[4] Defendant filed a pre-trial motion to suppress his handwritten statement. The record does not include defendant's motion or the transcript on the hearing of his motion to suppress. Previously, on direct appeal, we noted that defendant alleged in his motion that "the police had coerced him into making a false statement and that the police and an Assistant State's Attorney failed to timely notify him of his attorney's arrival." *People v. Sidney McCray*, No. 1-04-1188 (March 2, 2007)(unpublished order pursuant to Illinois Supreme Court Rule 23).

Timothy "Jerry" Stephens. William Thompson had previously told him that he wanted to rob Hill and that he had a .45 caliber automatic handgun. Timothy Stephens went to Hill's door to see if Hill was home while William Thompson, defendant, Melvin Bradford and Antonio Richardson waited down the block. When they saw Hill come onto the porch and start talking to Timothy Stephens, they rushed up to the house. With the exception of Antonio Richardson, they took Hill downstairs to his apartment, where William Thompson held a gun to Hill's head and repeatedly asked him "where the s***t was[.]" When the victim did not say anything, Timothy Stephens and Melvin Bradford started beating him up. William Thompson and Timothy Stephens then took Hill to the back room and a few minutes later, they returned with Hill wearing only underwear and a t-shirt and Timothy Stephens carrying a safe. Everyone exited the apartment on the first floor and walked Hill into the alley.

¶ 43 Defendant, William Thompson, Melvin Bradford and Timothy Stephens and Hill walked into the alley. William Thompson handed the gun to defendant, and defendant shot Hill either in the chest or the shoulder, causing Hill to fall to the ground. Defendant fired two more gunshots at Hill. He handed the gun to Timothy Stephens and ran to his girlfriend's house.

¶ 44 After defendant provided this oral statement, the felony review unit of the Cook County State's Attorney Office was notified, and ASA Jennifer Coleman came to the station. Detective Hartman did not have any further involvement in this case.

¶ 45 Assistant State's Attorney Jennifer Coleman (ASA Coleman) testified that she arrived at the police station on January 9, 1999, at 6:00 a.m**.** After reviewing the police reports and interviewing George Ward, she met defendant inside the "roll call room" located inside the detectives' division. Defendant was brought into that room by some detectives. She advised him of his constitutional rights, and he agreed to speak with her and Detective David Wright about the victim's murder.

Between 9:00 and 9:30 a.m., they interviewed defendant, and then she asked Detective Wright to leave the room. She asked defendant how he had been treated, if he was given food to eat and allowed to sleep and use the bathroom. She testified that defendant did not complain about anything that had taken place at the station.

¶ 46    ASA Coleman and defendant remained inside the roll call room while she wrote out defendant's handwritten statement, asking him questions as she did so. The door to the roll call room was closed throughout the time that she interviewed defendant. In defendant's handwritten statement, he stated that he lived with his sister and was previously a member of the Gangster Disciples street gang for one year, but he quit the gang two months ago. He remained friends with other gang members including Timothy "Jerry" Stephens, Antonio "Ray Ray" Richardson, Terrell "Shorty T" Thompson,[5] and Melvin "Brother" Bradford. Defendant also knew Hill, and he knew that Hill was also a member of the Gangster Disciples who supplied heroin and marijuana to the gang in large quantities for the gang to resell. Defendant previously bought "weed" and heroin from Hill for which Hill charged him "$150.00 a gram for heroin and $800 per pound for "weed." Defendant stated that he purchased two pounds of "weed" from Hill in early October of 1998, to resell it on the street, but Hill only gave him 1 ½ pounds. When defendant went to ask him about the shortage, Hill told he would "hit him later" meaning that Hill would give defendant the drugs owed to him. Defendant stated that Hill never gave him the other half pound of "weed" or returned the money.

¶ 47    Defendant further stated that on October 29, 1998, he was hanging out with Melvin Bradford when Thompson, Richardson, and Stephens pulled up in a van. Defendant and Bradford got into the van, and they went to buy "weed" but that location did not have any so they went to Hill's

---

[5] Terrell "Shorty T" Thompson was identified by other people as William Thompson.

house. Defendant went to the liquor store while Thompson went to buy "weed" from Hill. Defendant became angry when Thompson told defendant that Hill had charged them for the "weed" because defendant thought it should have been free. They drove around in the van smoking "weed" and drinking until defendant was dropped off at his girlfriend's house.

¶ 48    Later that night, defendant met up with Thompson, Bradford, Richardson, and Stephens. Thompson told defendant that he was mad because he thought Hill should have given him some "weed" to sell after Thompson got out of jail so he could "get back on his feet." At that point, Thompson, who had a .45 caliber automatic handgun, devised a plan to rob Hill. Defendant, Thompson, and Richardson would wait down the street, while Stephens went up the Hill's door to see if Hill was home. When defendant saw Hill on the porch talking to Stephens, defendant, Thompson, and Bradford went ran up to the house and took Hill into his basement apartment. Thompson held the gun to Hill's head and asked him "where the s**t at." Hill did not answer so Bradford and Stephens started to beat him with their fists. Defendant saw Thompson take Hill to the back room of the apartment. A few minutes later, Hill came out wearing underwear and a t-shirt. Defendant also saw Stephens carrying a safe.

¶ 49    Defendant further stated that he, Thompson, Stephens, and Bradford took Hill outside to the alley. Thompson handed the gun to defendant. Defendant asked Hill about the money, and Hill told defendant that he would get him his money and "weed" if they would let him go. Defendant stated that he fired the gun at Hill and shot him in the shoulder or the chest. As Hill was falling, defendant shot him two more times. Defendant handed the gun to Stephens and ran to his girlfriend's house. Defendant had not seen Thompson, Bradford, or Stephens since that day, and he did not know what happened to the gun. He stated that he had been treated well by the police and ASA Coleman, allowed to sleep all night, given food from McDonalds and Coke to drink, and

allowed to use the bathroom when he wanted. He was not promised anything in exchange for his statement, and he was free from the effects of drugs and alcohol. It was written on the first page of the handwritten statement that the statement commenced at 10:15 a.m.

¶ 50 ASA Coleman further testified that she reviewed the handwritten statement with defendant, allowed him to make corrections, and allowed him to read the statement himself before he signed each page of the handwritten statement. After defendant had signed each page of the statement, at approximately 11:30 a.m., Detective Sanders knocked on the door to the interview room and asked to speak to her in the hallway. After speaking with him, ASA Coleman went back into the room and told defendant that someone had called the police station stating that he was a lawyer representing defendant, but Detective Sanders did not know the name of this person. She then left the interview room. She remained at the station to prepare paperwork and went back into a different interview room at 12:30 p.m. to take Polaroid photos of defendant, which were attached to his handwritten statement.

¶ 51                               Defense Case

¶ 52                              Marvin Marshall

¶ 53 Marvin Marshall testified that he was a criminal defense attorney, and on January 9, 1999, he was asked by defendant's family to represent him. He had been friends with defendant's brother but had never met defendant. The family gave him the name of Detective Sanders. Marshall testified, on direct examination that, after learning where defendant was located, he called the police station at approximately 10:30 a.m. He informed the person who answered the phone that he had been retained by defendant's family, that he was on his way to the station, and to not speak to defendant without him being present. He also testified that called the police station at 11:00 a.m. On cross examination, he was impeached with his testimony at the hearing on defendant's motion

to suppress that he received a page from defendant's brother at 10:30 a.m., called him back, and he spoke with Detective Sanders on the phone at 11:24 a.m.

¶ 54    He initially testified that he arrived at the police station between 11:30 a.m. and 12:00 p.m., and that it took him thirty to forty minutes to drive to the police station. He was impeached by his prior testimony that he arrived at the second-floor detective's division at 12:05 p.m. He went to the front desk of the second-floor detectives' division and asked to speak with Detective Sanders. The front desk attendant stated that Detective Sanders was "out." At that time, he saw a young man, now known as defendant, a black male, and a white female walk into a room. He was not permitted to speak with defendant at that time and waited in the waiting area for 30-45 minutes. During that time, some of defendant's family members, "either a sister or a cousin," also arrived. Then, Marshall told the front desk attendant that he wanted to see defendant immediately. The attendant spoke to two people inside an office, but he could not hear the conversation. The attendant returned and said that he could speak with defendant in a few minutes. He saw defendant and the black officer and defendant walk towards another room while the white female walked in a different direction. The black officer then approached Marshall and told him that he could speak with defendant. Marshall did not know if the white female was ASA Jennifer Coleman as her hair was different, and he could not identify the black officer and did not know his name. Marshall testified that he left the police station between 1:00 and 1:30 p.m.

¶ 55                              Defendant's Testimony

¶ 56    Defendant testified that he did not murder Dwayne Hill. He explained that on the night and the early morning hours of October 28 through 29, 1998, he was "[p]robably at my sister [sic] house" but he did not "know for certain" where he was that night. Prior to getting arrested, he did not know that the police were looking for him. He knew that the victim had been killed, but he did not

have any firsthand knowledge of his death. He admitted that he signed an inculpatory handwritten statement, but he testified that he did so because the police forced him to sign the statement. According to defendant, he told the police that he was not involved in Hill's murder, but they kept questioning him and told him that Antonio Richardson and Timothy Stephens had already signed statements implicating him in the murder. Defendant testified that Detective Hartman told him that if he made a statement about the murder, defendant would only get a 20-year sentence; otherwise, he would go to prison for life. Defendant further testified that he continued to deny involvement, and Detective Hartman told him that he wanted him to admit that he killed Hill. At that point, defendant admitted that he killed Hill, but Detective Hartman said that he needed more detail. Defendant testified that he said that he killed Hill because he "was trying to do anything to get out of that room at that particular time." Detective Hartman then provided him the details to put in his handwritten statement; however, he admitted that he made up the story about buying drugs from Hill. He denied that he had ever been to Hill's house or that he had purchased marijuana or heroin from him. When he spoke with ASA Coleman, he did not need to stop and ask the detective what he should say because he had already memorized it. He also testified that, when he met with his attorney, he had just signed the statement "five or three minutes ago."

¶ 57                                    Rebuttal Case

¶ 58      Chicago Police Detective Robert Hartman was recalled and testified that defendant told him during the initial interview that he was riding around all night with William Thompson, Melvin Bradford, and Antonio Richardson "getting high…" He fell asleep in the van and heard that Hill had been killed the next morning. Defendant did not tell him that he did not know where he was at the time of Hill's murder. During a subsequent interview, defendant told him that he went with William Thompson, Melvin Bradford, Antonio Richardson and "Black Face" to Hill's house on

Maypole, they went downstairs into Hill's basement apartment and looked around "for "s**t" but did not find anything. They went back upstairs, walked outside, and saw William Thompson, Antonio Richardson, Melvin Bradford, and "Black Face" take Hill around the corner and into the alley. He saw William Thompson shoot Hill in the head.

¶ 59　　In the next interview, defendant told him that he was in a van with William Thompson, Melvin Bradford, Timothy Stephens, and "another dude" and drove to an area to buy some marijuana. No one was selling at that location, so they went to Hill's house. They all went downstairs, William Thompson took Hill into the back room to look for money and "weed," and then they all left the apartment with Hill. They took him into the alley where William Thompson shot Hill, defendant shot Hill, and then Timothy Stephens took the gun and shot Hill. He described the gun as a big, black, automatic handgun.

¶ 60　　During the next interview, during which Detective Wright was also present, defendant stated that he was in a van with Antonio Richardson, in addition to the four people he already named. They were unable to purchase marijuana from the other drug spot, so they drove to Maypole where he purchased some liquor at a liquor store while William Thompson and Timothy Stephens got out of the van, and they then drove around for a few hours before he was dropped off at his girlfriend's house. Defendant stated that he left there to meet William Thompson at Hill's house. He saw William Thompson, Timothy Stephens and Melvin Bradford coming out of Hill's house and that William Thompson had Hill's keys. William Thompson told him not to worry about how he got the keys. They all went into Hill's house and then left with Hill and Timothy Stephens was carrying the safe. They walked westbound towards the alley. Defendant saw William Thompson shoot Hill. William Thompson told defendant "You better shoot this n****r, too" and then

defendant shot Hill. Defendant handed the gun to Timothy Stephens and turned around to leave. He heard two more gunshots.

¶ 61    Detective Hartman denied that he told defendant what to say to ASA Coleman or in the handwritten statement, that he told defendant that he would go to prison for the rest of his life if he did not make a statement, that he would get 20 years if he signed a handwritten statement, and that defendant was shown the handwritten statements of Antonio Richardson and Timothy Stephens. He testified that each time he spoke with defendant, defendant's story changed slightly. He denied that he rehearsed with defendant what to say to ASA Coleman.

¶ 62    Chicago Police Detective Stanley Sanders testified that on January 9, 1999, he was working and knew that defendant was in custody. At approximately 11:30 a.m., he went to the roll call room and knocked on the door. ASA Coleman responded to the knock on the door, and he told her that "our phone guy" had received a call from some person saying that they were representing defendant, and that they were coming to the station. ASA Coleman told him "okay" and closed the door. He testified that he did not speak with anyone on the phone or meet with anyone who stated that they represented defendant. He did not speak with Marvin Marshall at the station.

¶ 63    ASA Jennifer Coleman was recalled, and she testified that she did not see Marvin Marshall at the police station that day. She also did not hear anyone say that there was an attorney at the station for defendant.

¶ 64    The jury found defendant guilty of first-degree murder, home invasion, and armed robbery. The trial court sentenced him to 45 years' imprisonment for first-degree murder and two concurrent sentences of 20 years' imprisonment for home invasion and armed robbery.

¶ 65                                            Direct Appeal

¶ 66      Defendant challenged his conviction on direct appeal on the basis that: 1) the evidence at trial was insufficient to prove him guilty beyond a reasonable doubt; 2) he was denied a fair trial because the trial court admitted the testimonial statements of two witnesses to be used as substantive evidence defendant was unable to meaningfully cross-examine these witnesses as to these statements; 3) the trial court violated 725 ILCS 5/115-10.1 by allowing the State to admit the statement of Rontral Lee, an informant witness; 4) the trial court erred in allowing the State to present testimony that the codefendants had pled guilty to the same charges for which defendant was on trial; 5) the prosecutor misstated the evidence during closing argument; and 6) the compulsory extraction of his blood and the storage of his DNA profile constituted an unreasonable search and seizure.

¶ 67      On March 2, 2007, defendant's conviction was affirmed. *People v. Sidney McCray*, No. 1-04-1188 (March 2, 2007) (unpublished order pursuant to Illinios Supreme Court Rule 23). The court found that the evidence was sufficient to sustain defendant's conviction, however, it also found that the trial court erred in allowing the State to introduce Rontral Lee's testimony regarding defendant's inculpatory statements to him after the murder.

¶ 68                                Initial Postconviction Petition

¶ 69      On October 30, 2007, defendant filed a *pro se* postconviction petition alleging that his indictment cited to a 1992 statute that was not in effect at the time of the offense and fellow prisoners received relief due to the unconstitutional provision; the police unlawfully arrested and beat him which forced him to give an untrue statement; and his trial and appellate counsel were ineffective. The circuit court dismissed defendant's postconviction petition after finding that it was frivolous and patently without merit. When defendant appealed, his appellate attorney concluded

that there were no grounds of appealable merit and asked for leave to withdraw from the case. This court granted counsel's motion and affirmed the circuit court's dismissal of defendant's initial postconviction petition. *People v. Sidney McCray*, No. 1-08-0669 (July 24, 2009).

¶ 70                                    Successive Postconviction Petition

¶ 71      On September 12, 2014, defendant filed a *pro se* successive postconviction petition in which he asserted, in part, a claim of actual innocence. Defendant attached his own affidavit, dated August 22, 2014. In this affidavit, he averred, in part, that he was innocent of Hill's murder, his confession in this case was obtained as a result of "coercion and abusive tactics" by Detectives Wright and Hartman, had "never met Marquette Anderson before Michael Adams informed me about him[,]" and he "told my counsel that a [sic] date of this crime I was with Tina Gentry."

¶ 72      Defendant attached the affidavit of Tina Gentry who averred, in part, that defendant was with her on October 28th and 29th at his home at 4327 West 18th Street in Chicago. Defendant attached the affidavits of Antonio Richardson and Timothy Stephens, which were consistent with their trial testimony that they were not present at the time that Hill was shot.

¶ 73      Defendant also attached the affidavit of Marquette Anderson, dated November 4, 2013, who averred, in part, that he was living on the first floor of the residence at 3229 West Maypole with his mother, Michelle Anderson, and his step-father, William Barnette. At 11:30 p.m., he was in the living room watching television when he saw Hill, Shorty T, Ray Ray, and Jerry enter the house and go downstairs to the basement. He asked Hill for money and "[a]fter a while," went downstairs to get the money from him. He called Hill's name, but hearing no answer, he exited the house through the back door because it was open. When he got to the alley, he saw Hill, Shorty T, Ray Ray and Jerry in the alley towards Homan Street. He walked towards them and saw Shorty T shoot Hill in the head. He turned around, ran back towards the house and heard three to four more

gunshots. He further averred that he was not aware that defendant had been convicted of Hill's murder until he was "kicking it with Michael Adams (Lil Mike)" in the jail yard and told him that defendant was in the same prison serving time for killing Hill.

¶ 74    The circuit court ultimately advanced the petition for a third stage hearing on defendant's claim of actual innocence. The trial court also concluded that Tina Gentry's affidavit relating to photos showing injuries to defendant was barred by *res judicata*. The circuit court found that Tina Gentry's affidavit, relating to her providing an alibi for defendant, did not meet the requirements of being newly-discovered evidence to support his claim of actual innocence. On November 19, 2018, a third-stage hearing was held. At the third-stage hearing, defendant presented the testimony of Marquette Anderson (Marquette). The State presented the testimony of Mark Morrissey.

¶ 75                              Third-Stage Evidentiary Hearing

¶ 76                                   Marquette Anderson

¶ 77    Marquette testified that, at the time of the victim's murder, he was 13 years old and lived on the first floor of a two-flat building at 3229 West Maypole, Chicago, Illinois, along with his mother, Michelle Anderson, and his stepfather, William Burnett. Marquette's stepbrother, Dwayne Hill, lived in an apartment in the basement. On the night of the victim's murder, Marquette was watching television in the living room while his mother and stepfather were "in the back part of the house" on the first floor. At 11:00 p.m., he saw Hill enter the front door along with Shorty T, Ray Ray, and Jerry. Shorty T was in a relationship with Marquette's cousin, Daphne Anderson, and he knew Ray Ray and Jerry as he saw them hanging out in the neighborhood and going to the liquor store. He did not see defendant, someone he already knew from the neighborhood, enter the home with these men.

¶ 78    When Hill and the three other men entered the home and were walking towards the entrance to the basement, Marquette's mother told him that it was time for him to go to bed. Marquette asked her for money to buy shoes and clothing, but his mother said no. He then asked Hill for money and Hill agreed and told him to come downstairs in a few minutes. Marquette went back into the living room.

¶ 79    At 11:30 p.m., Marquette went downstairs and called Hill's name, but there was no answer. He went towards Hill's room and saw that he was not there. He looked towards the rear of the basement and saw that the door was open. Marquette walked towards the rear of the basement and exited that door. He checked for Hill in the garage, located in the rear of the property, but did not see anyone inside the garage. From the alley, when he looked in the direction of Homan Avenue, he saw Shorty T holding a gun in his hand and firing that gun at Hill. He did not see defendant in that area, and he did not see defendant shoot the victim. Marquette testified that he was "hard of hearing" but that he heard two gunshots before he ran and then heard two more shots as he ran away.

¶ 80    He further testified that he ran back to the basement, saw his mother on the first floor, and told her what he had seen. His mother told him, "[D]on't say anything, just leave everything alone, because she don't [sic] want me to get involved." His mother called a friend who lived nearby, told Marquette to quickly pack up his clothes and then sent him to stay with his grandmother, who lived at 1826 South Kedzie, Chicago, Illinois. He stayed with his grandmother for five more years, and he did not speak to any police officers. He did not know if the police were looking for him.

¶ 81    When he was incarcerated at Menard, he learned for the first time that there was a trial in this case and that defendant had been convicted of Hill's murder. He discovered this information for the first time when he had a conversation with Michael Adams, another inmate and someone he

knew from the neighborhood. During a discussion about Hill's murder, Adams told him that defendant was "locked up" for this offense. Marquette testified that this conversation occurred in November of 2013, and that defendant was also incarcerated at Menard at this time but was not present for this conversation with Adams.

¶ 82    Marquette further testified that he "immediately" wrote a letter to the Cook County State's Attorney's Office in which he informed them that they had the wrong person locked up for Hill's murder. He also composed an affidavit. Then, on September 17, 2014, he was interviewed by an assistant state's attorney and an investigator.

¶ 83    During cross-examination, Marquette testified that Shorty T, Ray Ray, and Jerry arrived at the house when it was dark outside, "but it was light." He admitted that, at the time of the shooting, he was "far away" and was "one whole complex away" from where the shooting occurred, and he looked in that direction for "a matter of seconds[.]" He loved the victim and would do anything for him. He testified that his mother was scared because "it was a gang-affiliated area and Shorty T had some type of position in it."

¶ 84                              Mark Morrissey

¶ 85    The State presented the testimony of Mark Morrissey, a former investigator with the Cook County State's Attorney Office, who testified that on September 25, 2014, he interviewed Marquette Anderson, along with an assistant state's attorney. During the interview, Marquette agreed to speak with them about what he knew about the murder. Marquette described what happened in the alley and said that he did not see defendant in the alley. During the interview, Marquette did not mention anyone nicknamed "Shorty T" but in his previous letter, he identified "Shorty T" as the shooter. Marquette described the lighting conditions in the alley as "dark." He also said that the shooting occurred "a few houses from where he was standing." Marquette also

did not mention Michael Adams during the interview. Marquette also told him that when he saw Hill's room, there was no one inside and he did not follow anyone when he went to the alley.

¶ 86    The circuit court granted defendant's request to admit Marquette's letter and affidavit into evidence. The circuit court also granted the State's request to introduce the "[a]ppellate record" into evidence. The circuit court, after hearing arguments, made the following findings:

"After reviewing the trial record and observing the witnesses who testified at this third-stage hearing the Court makes the following findings of fact:

The Court finds that the affidavit and testimony of Marquette Anderson does constitute newly-discovered evidence. He testified that he was 13-years old at the time and after he saw what he allegedly saw he told his mom and his mom immediately got him out of the neighborhood and sent him to live with his grandmother and he did not learn that [defendant] had been convicted of Dwayne Hill's murder until many years later. I think that based on the records that we have before us that his affidavit does constitute newly-discovered evidence.

This Court does not find that his testimony is merely cumulative of the testimony of the other witnesses at trial - - well, it's not cumulative of all the evidence that came in at trial because clearly it contradicts the written statements that the witnesses recanted which were later admitted under Section 115-10 of the Illinois Statute, so I believe that the second requirement for an actual innocence claim has been met. However, I think that where the Petitioner's case fails is regarding the third requirement, that the evidence must be of such conclusive character that it would probably change the result on retrial.

I had an opportunity to observe the testimony of Mr. Anderson during the third-stage hearing before this Court and did not find it to be so reliable that it would probably change the outcome - - that it probably would have changed the outcome of the trial, and because of that I'm going to respectfully deny the petition for new trial."

¶ 87                                    ANALYSIS

¶ 88     The Illinois Post-Conviction Hearing Act provides a three-stage process for defendant who allege a substantial deprivation of their constitutional rights. *People v. Cotto*, 2016 IL 119006, ¶ 26. In this case, the petition advanced to the third-stage evidentiary hearing. See 725 ILCS 5/122-6 (West 2012). At the third-stage evidentiary hearing, defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill.2d 458, 473 (2006). The court may receive affidavits, depositions, oral testimony, or other evidence to weigh the merits of the petition and determine whether the defendant is entitled to relief. *Id*. Following an evidentiary hearing where fact finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous. *People v. Ortiz*, 235 Ill.2d 319, 333 (2009). "Manifest error" is defined as "error which is 'clearly evident, plain, and indisputable.'" *People v. Morgan*, 212 Ill.2d 148, 155 (2004). Thus, under this standard, a reviewing court must give great deference to the trial court's factual findings following an evidentiary hearing because the trial court stands in the best position to weigh the credibility of the witnesses. *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 31; see *People v. Coleman*, 183 Ill.2d 366, 384 (1998).

¶ 89     Postconviction petitioners are afforded the right to assert a freestanding claim of actual innocence based on newly discovered evidence pursuant to the due process clause of the Illinois

Constitution. *People v. Ortiz*, 235 Ill.2d 319, 333 (2009). Evidence in support of a claim of actual innocence must be: (1) newly discovered; (2) not discoverable earlier through the exercise of due diligence; (3) material and not merely cumulative; and (4) of such conclusive character that, when considered along with the evidence that was presented at trial, the new evidence would probably change the result on retrial. *People v. Sanders*, 2016 IL 118123, ¶ 24. Conclusive evidence means that the evidence, when considered along with the trial evidence, would probably lead to a different result. *Ortiz*, 235 Ill.2d at 336-37. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *People v. Coleman*, 2013 IL 113307, ¶¶ 96-97.

¶ 90 Here, defendant contends that the trial court erred in concluding that the testimony of Marquette Anderson would not have probably changed the result on retrial. The other elements for establishing his claim of actual innocence are not in dispute.

¶ 91 Initially, defendant argues that the circuit court's finding was inconsistent, and thus erroneous, when it found that Marquette's testimony was "credible" and at the same time it also found that it was "not of a nature that would probably have changed the outcome…" In turn, the State argues that when the circuit court found that Marquette's testimony was not so "reliable" that it would probably not change the outcome of the trial, the circuit court necessarily found that Marquette's testimony was not credible. In his reply brief, defendant acknowledges the State's argument, but does not directly address it; instead, arguing that the circuit court was "improperly substituting its own opinion on the credibility of Mr. Anderson's eyewitness account" and that it was up to a jury to decide the credibility of his testimony.

¶ 92 Specifically, the circuit court found, in part, that "…I had an opportunity to observe the testimony of Mr. Anderson during the third-stage hearing before this Court and did not find it to

be so reliable that it would probably change the outcome - - that it probably would have changed the outcome of the trial, and because of that I'm going to respectfully deny the petition for new trial."

¶ 93    We agree with the State that when the circuit court found that Marquette's testimony was not "so reliable," it was synonymous with the court finding that this testimony was not credible. Moreover, it is well-recognized that it is entirely within the province of the circuit court to make credibility determinations during a third-stage evidentiary hearing. *People v. Sanders*, 2016 IL 118123, ¶ 42 ("Credibility determinations may be made only at a third-stage evidentiary hearing.") Therefore, we reject defendant's argument that the circuit court found Marquette's account of the shooting to be credible.

¶ 94    Thus, having found that the circuit court concluded that Marquette was not credible, the remaining question before us is "whether the evidence supporting the *** petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *People v. Robinson*, 2020 IL 123849, ¶ 47. Defendant argues that the evidence at trial was weak in that the State relied upon the testimony of Timothy Stephens and Antonio Richardson, former codefendants who took plea deals and who recanted their prior statements to the police inculpating defendant as participating in the home invasion and armed robbery as well as being the shooter. He also points out that, at trial, he denied the substance of his prior statement to the police in which he admitted his involvement in this offense, and there was no physical evidence tying defendant to the scene. In addition to arguing that the evidence at trial was weak, defendant also argues that the presentation of Marquette's testimony was significant in that he testified that defendant was not present and was not the shooter, and, without any further explanation as to how, he argues that Marquette's testimony corroborated the physical evidence.

¶ 95    However, we recognize that when defendant attacked the sufficiency of the evidence, on direct appeal, this court found that the evidence in this case was sufficient to sustain his conviction. *People v. Harris*, 206 Ill.2d 293, 302 (2002) (in addressing the defendant's claim of actual innocence, the supreme court relied upon its previous finding, on direct appeal, regarding the sufficiency of the evidence). At that time, in upholding defendant's conviction, this court addressed the same attacks on the sufficiency of the evidence as presented by defendant here and balanced that with the evidence presented by the State to show that the handwritten statements were not coerced. In part, this court found that "these [codefendants'] statements are sufficient to prove a defendant's guilt, even if the codefendants' statements are uncorroborated" and, in light of the evidence presented by the State to rebut defendant's argument that the statements were obtained as a result of coercion, "[t]he verdict in this case reveals that the jury did not find the witness' recantations to be credible." Moreover, when addressing a claim for plain error, this court also found that the evidence was not closely balanced.

¶ 96    That being said, we now consider the evidence admitted at trial in light of the newly-discovered evidence presented in defendant's postconviction petition. While at trial, defendant argued that his handwritten statement was coerced because the police made promises to him as to a possible sentence, and his statement was obtained because the police delayed when he had access to an attorney, the new evidence presented at the third-stage hearing does not provide any further evidence to support these theories. Therefore, the new evidence that defendant presented at the third-stage hearing exclusively relates to his contention that he was not present inside Hill's residence, did not participate in the home invasion and armed robbery, and was not the person who fired the shots at Hill in the alley. We recognize, however, that the evidence that defendant relied upon in his successive postconviction petition was contradictory in several aspects.

¶ 97        Defendant relies upon contradictory evidence as to who was present at the time of the shooting. Marquette testified at the evidentiary hearing that he saw Hill with William Thompson, Antonio Richardson, and Timothy Stephens inside the home and again in the alley at the time that Hill was shot, and that William Thompson, not defendant, was the shooter. However, both Antonio Richardson and Timothy Stephens testified at trial and averred in their affidavits attached to defendant's successive postconviction petition that they were not present at these times. Where the testimony of Marquette directly contradicts the affidavits of Richardson and Stephens, as well as their trial testimony, this contradiction supports the circuit court's conclusion that this additional evidence was not of such conclusive character that, when considered along with the evidence that was presented at trial, it would probably change the result on retrial.

¶ 98        We also look at defendant's averment in his affidavit, attached to his successive postconviction petition, that he and his girlfriend, Tina Gentry, were at his home at the time of the murder. However, these averments contradict his trial testimony that although he did not "know for certain" where he was that night, he was "[p]robably at my sister [sic] house[.]" Defendant did not present the testimony of Tina Gentry at trial and did not seek to present an alibi defense at trial. The circuit court also did not allow defendant to present the testimony of Tina Gentry at the third-stage evidentiary hearing, as to her averment in her affidavit that she was with defendant, when it ruled that Tina Gentry's affidavit did not constitute newly-discovered evidence.

¶ 99        Moreover, Marquette's description of what he observed that day was suspect. While the testimony at trial showed that defendant, William Thompson, Timothy Stephens, Antonio Richardson, and Melvin Bradford forced their way into the home and then forced Hill downstairs to his basement apartment, Marquette's testified at the hearing that nothing unusual happened when he spoke with Hill before Hill and the others went downstairs. At trial, the State introduced

photographs showing that Hill's apartment had been ransacked, including drawers pulled open and a mattress pulled off the bed frame. However, Marquette never averred in his affidavit or testified at the hearing that he noticed anything askew when he went downstairs to Hill's apartment. Moreover, Marquette testified that he did not hear any noise from downstairs, including arguments, fighting, scraping, or "loud bangs[.]"

¶ 100    Marquette's opportunity to view the shooting is suspect. He admitted to the investigator that he viewed the shooting scene for only a matter of seconds, it was dark outside, and the shooting occurred "a few houses from where he was standing." At trial, Detective O'Connor testified that Hill's body was found approximately eight houses west of Hill's apartment. Moreover, Marquette testified that he ran back to his house and told his mother that Shorty T shot Hill, but that his mother then immediately took him to live with his grandmother. The police did not discover Hill's body until several hours later, meaning that Marquette's mother, who was living with Hill's father at the time, did not report the shooting of Hill to the police or to anyone else, leaving him in the alley despite learning that he had been shot. Hill remained unidentified by the police until Veronica Dunlap came to the police station later that morning to report his disappearance.

¶ 101    Thus, Marquette's testimony, as well as the other evidence presented, was not of such a conclusive character that, when considered along with the trial evidence, would probably lead to a different result on retrial. Accordingly, the circuit court's denial of defendant's postconviction petition was not manifestly erroneous.

¶ 102    Defendant cites to several cases in support of his argument. For instance, he cites to *People v. Ortiz*, 235 Ill.2d 319 (2009), to support his argument. In *Ortiz*, our supreme court granted the defendant a new trial based on the testimony of a newly discovered additional eyewitness. *Id*. at 333-37. The court held that the testimony was newly discovered where the witness did not admit

witnessing the incident until more than 10 years after trial and made himself unavailable as a witness when he moved to a neighboring state shortly after the murder. *Id.* at 325. However, in *Ortiz*, the trial court did not assess the credibility of the testimony provided by the new witness. Here, the circuit court found that Marquette was not credible. Thus, *Ortiz* is distinguishable from this case.

¶ 103       Defendant cites to *People v. Adams*, 2013 IL App (1st) 111081, as a case in which the reviewing court found that the defendant had sufficiently raised his claim of actual innocence where the defendant presented affidavits from two newly discovered witnesses that they were present at the time of the shooting, but did not see the defendant there. However, we note that the defendant's case was reviewed at a different point in the postconviction process; namely, following the trial court's denial of the defendant's request for leave to file a successive postconviction petition. *Adams*, 2013 IL App (1st) 111081, 29. Here, we are asked to review defendant's claim of actual innocence following a third-stage evidentiary hearing. Therefore, the difference in the procedural posture of *Adams* means that it does not support defendant's position in this case.

¶ 104       Defendant also cites to *People v. Williams*, 2019 IL App (1st) 160503-U, without acknowledging that it was an unpublished decision in his opening brief. In turn, the State argued that defendant cannot rely upon this case as precedent because this decision was unpublished pursuant to Illinois Supreme Court Rule 23, defendant did not present any exception to allow to be cited as precedent. See Ill. Sup. Ct. R. 23(e)(1) (eff. Feb. 1, 2023). We decline to consider defendant's citation to this unpublished decision and agree that defendant's reliance upon this case for precedential value is misplaced.

¶ 105       Defendant also argues that the circuit court's finding that Marquette's testimony would probably not have changed the outcome was contrary to the circuit court's "own statement at the

2nd stage in stating that the testimony of [Marquette] would have bolstered at trial the recantation of [defendant.]" In making this argument, defendant fails to recognize that the circuit court's comments were made during the second stage of postconviction proceedings in which the court must accept the truth of the factual allegations presented by defendant unless they are not positively rebutted by the record. *People v. Hall*, 217 Ill.2d 324, 334 (2005). However, at the third stage of postconviction proceedings, credibility findings and determinations as to the reliability of the supporting evidence are to be made, and that presumption no longer exists. *People v. Robinson*, 2020 IL 123849, ¶ 61. The circuit court's comments at the second stage of postconviction proceedings do not persuade us to find that the court's decision was manifestly erroneous.

¶ 106                                    CONCLUSION

¶ 107        For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 108    Affirmed.